UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**DIANE R. SKIFF**,                                              Case No. 3:14-CV-899-KI

                    Plaintiff,                    OPINION AND ORDER

        v.

**COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION**,

                    Defendant.


        Richard McGinty
        McGinty & Belcher,
        P.O. Box 12806
        Salem, OR 97301

                Attorney for Plaintiff


        Billy J. Williams
        United States Attorney
        District of Oregon


Page 1 - OPINION AND ORDER

Ronald K. Silver
Assistant United States Attorney
1000 SW Third Ave., Suite 600
Portland, OR 97201-2902

Leisa A. Wolf
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Suite 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

KING, Judge:

      Plaintiff Diane Skiff brings this action pursuant to section 205(g) of the Social Security

Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB").

I affirm the decision of the Commissioner.

## BACKGROUND

      Skiff protectively filed an application for DIB on October 26, 2010, alleging disability

beginning September 2, 2010.  The application was denied initially and upon reconsideration.

After a timely request for a hearing, Skiff, represented by counsel, appeared and testified before

an Administrative Law Judge ("ALJ") on January 22, 2013.

      On March 28, 2013, the ALJ issued a decision finding Skiff not disabled within the

meaning of the Act and therefore not entitled to benefits.  This decision became the final decision

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

April 21, 2014.

Page 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

Page 3 - OPINION AND ORDER

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less

than a preponderance. *Id.* (internal quotation omitted).  The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the

evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ found Skiff had degenerative disc disease and affective disorder.  The ALJ also

found these impairments, either singly or in combination, did not meet or medically equal the

requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  Given

these severe impairments, the ALJ concluded Skiff could perform light work, with the following

conditions:  she can only occasionally lift or carry 20 pounds and frequently lift 10 pounds; she

can sit, stand, or walk for up to six hours each in an eight-hour workday; she can frequently

climb ramps and stairs and occasionally perform all other postural movements; she can

understand, remember, and carry out simple, repetitive tasks; and she can concentrate in two-

hour increments with usual and customary breaks throughout an eight-hour workday.

Given this residual functional capacity ("RFC"), the ALJ found Skiff cannot perform her

past work, but can perform other work in the national economy including mail sorter, laundry

folder, and packing line worker.  Accordingly, the ALJ found Skiff not disabled under the Social

Security Act.

## FACTS

Skiff, 51 years old at the time of her alleged onset date of disability, has a high school

diploma and a work history delivering auto parts, working as a receptionist, a sales associate, and

most recently as a custodian at a hospital.  She injured herself at work in August 2009, sought

Page 5 - OPINION AND ORDER

treatment from Gregory M. Thomas, M.D., and was moved to a part-time, light duty position in the marketing department of the hospital.  In July 2010, when the hospital had no more work in the department for Skiff, it terminated her employment.

An MRI in September 2009 revealed mild degenerative spondylosis and minimal scoliosis of the thoracic spine.  Dr. Thomas referred Skiff to J. David Hook, M.D., with Salem Rehab Associates.  Skiff started physical therapy, occupational therapy, received thoracic spinal injections, and attended a pain clinic.  The injections brought no relief.  However, in June and July 2010, Skiff reported progress with the combination of physical, occupational, and psychological treatment.  Tr. 388.  She was discharged from physical and occupational therapy in July 2010 as she reported she would be receiving short-term disability benefits to maximize her rehabilitation.  At the time of discharge, she reported pain at a level of 3 out of 10.

Skiff's psychological treatment took place over the course of three months.  During his initial evaluation, Steven E. Besing, Ph.D., noted Skiff's years-long struggle with depression, and her current fear that her back pain would not improve and she would lose her job.  Her prescriptions included:  Wellbutrin, Lorazepam, and Amitriptyline.  Skiff told Dr. Besing she enjoyed camping, gardening and playing with her grandchildren in her free time.  Dr. Besing noted Skiff appeared alert, cooperative, friendly, coherent, and logical.  When talking about her pain, she became tearful and demonstrated behavior consistent with depression and anxiety.  Skiff's test results on the MMPI-2-RF suggested over reporting of physical symptoms, and she remained focused on somatic symptoms.  Dr. Besing predicted Skiff would "see herself as being in poor health.  She will report problems with fatigue and weakness.  Specific somatic symptoms will include gastrointestinal, head pain, and neurological symptoms.  She will also likely note

impact of physical symptoms on cognition." Tr. 283.  Dr. Besing diagnosed pain disorder

associated with psychological factors (depression and anxiety) and a general medical condition

(thoracic chest wall pain); major depressive disorder; chronic pain; and assigned a Global

Assessment of Functioning ("GAF") score of 55.[1]  He thought she could benefit from six to 12

sessions to work on improving her mood, reducing stress, and teaching her methods to cope with

her pain.

      Over the following six sessions with Dr. Besing, Skiff learned pain management

techniques, relaxation, breaking up activities at home, and stress management strategies.  In July

2010, she reported her decision to pursue disability; her mood was improved.  She did not want

any additional appointments with Dr. Besing.

      She saw Dr. Hook on two more occasions.  In September 2010, she reported taking

Cymbalta, Tramadol, and Amitriptyline; she had lost ten pounds and was doing the elliptical

machine twice a day for 10 minutes at a time.  She was also performing her home exercises.  She

demonstrated 5/5 strength in upper and lower extremities.  She talked, walked and moved slowly.

She had 11 of 18 fibromyalgia points and reported fairly widespread pain.  Dr. Hook thought

Skiff was experiencing depression secondary to her pain.  In December 2010, Skiff reported

trying to continue her home exercise program, but her pain was unchanged.  She demonstrated an

unremarkable gait, and normal strength, reflexes, and sensation.  Dr. Hook discontinued

---

    [1]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to
determine the individual's overall functioning. A GAF of 51 to 60 means "**Moderate symptoms**
(e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in
social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-
workers)."  The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental
Disorders* 34 (4th ed. 2000) ("DSM-IV").  The most recent edition of the DSM eliminated the
GAF scale. *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2012).

treatment as he had nothing more to offer Skiff, other than advice to continue her home exercise program.

 Beginning in February 2011, Skiff began treatment at McMinnville Community Acupuncture, with Brehan Crawford, a licensed acupuncturist.  She had five appointments in 2011, and then sought treatment from Crawford almost every month in 2012.  At the time of the hearing, Skiff testified she was no longer taking any anti-depressants or mental health medications but was treating her condition with acupuncture and Chinese herbs.  She reported the herbs helped "somewhat" because she experienced no side effects, but they did not address her anxiety.  Tr. 52-53.

Robert A. Kruger, Psy.D., examined Skiff at the request of Disability Determination Services in April 2011.  Skiff told Dr. Kruger that she could not work because of her back injury.  She was taking Tramadol, Amitriptyline, Lorazepam, Wellbutrin, Nexium, Voltaren gel, and Cyclobenzaprine.  She reported feeling sad, stressed, and sometimes suicidal, and remarked she had trouble multi-tasking.  Skiff told Dr. Kruger she had 60 chickens and sold their eggs.  She also had nine grandchildren and spent time with them when she could.  In a typical morning, she woke at 6 a.m. to make her husband breakfast and lunch, did some laundry, made the bed, fed the dog, and checked on the chickens.  In the afternoon, she walked around (they have 11 acres), checked on the chickens, picked up the house a little bit, watched some television, spent some time on the computer, and then she prepared dinner.

Dr. Kruger administered the SIMS test to determine whether Skiff malingered any psychopathology or neuropsychological symptoms; her score was moderately elevated suggesting the need to be cautious in interpreting her complaints and concerns.  In addition, Dr. Kruger

administered the TOMM to evaluate Skiff's motivation and effort, and whether any memory problems were malingered or real. Her results indicated exaggeration of her memory deficit. Dr. Kruger diagnosed the following conditions: pain disorder associated with psychological factors (depression) and a general medical condition (thoracic chest pain and other pain issues); and depressive disorder. Dr. Kruger found Skiff could understand simple-to-medium complex tasks without losing focus.

After an absence of almost two years, Skiff returned to Dr. Thomas in August 2012. She reported she had not worked for two years due to her thoracic pain and fibromyalgia. She had been taking as many as nine tramadol a day, when she was not to use more than six. She felt anxious and depressed. Dr. Thomas gave her samples of Viibryd.

In January 2013, David M. Freed, Ph.D., examined Skiff at the request of counsel. Dr. Freed decided not to administer the MMPI-2 due to Skiff's anxiety and pain behaviors. Based on other tests he administered, Dr. Freed identified some impairments in attention and concentration, low average verbal reasoning ability, a moderately impaired memory, and severe depression. He diagnosed the following impairments: major depressive disorder; post-traumatic stress disorder (provisional); panic disorder with agoraphobia; social phobia; cognitive disorder NOS; attention deficit hyperactivity disorder; reading disorder; and disorder of written expression. He assigned a GAF score of 55. He questioned the applicability of the specific tests administered by Dr. Kruger. Finally, Dr. Freed completed a Functional Assessment Form in which he opined Skiff would have moderate impairment (e.g. affecting her for a period of between 1 and 1 1/2 hours a day) in many functional areas such as: remembering, understanding and carrying out detailed instructions; maintaining attention and concentration for extended

Page 9 - OPINION AND ORDER

periods of time; maintaining regular attendance; performing at a consistent pace; completing a

normal work day and work week without interruptions from psychologically based symptoms;

accepting instructions and responding to supervisors; getting along with coworkers; and setting

realistic goals or making plans independent of others.

## DISCUSSION

Skiff challenges the ALJ's treatment of the psychiatric evaluations.

I.  <u>Severe Impairments</u>

Skiff argues the ALJ erred in failing to include her pain disorder and anxiety among her

severe impairments.  The threshold at step two is a low one.  It is a "de minimis screening device

[used] to dispose of groundless claims."  *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005)

(internal quotation omitted).  Here, the ALJ concluded one of Skiff's severe impairments is

affective disorder, described by all three psychologists as depression, demoralization, suicidal

ideation, and lack of interest.  However, the ALJ did not include anxiety and pain disorder among

Skiff's severe impairments.

The ALJ noted Skiff had not complained of anxiety to Dr. Kruger, Skiff was not taking

any anti-anxiety medications at the time of the hearing, and Skiff had not sought mental health

treatment.  The ALJ rejected the pain disorder diagnosis as being overly-reliant on Skiff's

complaints; Skiff does not challenge the ALJ's credibility analysis finding Skiff not entirely

credible in her representation of the intensity, persistence and limiting effects of her mental

health impairments.

In any event, any error the ALJ may have made in failing to include anxiety and the pain

disorder among Skiff's severe impairments is harmless.  The ALJ noted Dr. Besing found Skiff

Page 10 - OPINION AND ORDER

to be cooperative, friendly, spontaneous and talkative, without memory problems, and with average intelligence.  Dr. Besing believed Skiff could meet treatment goals in six to 12 weeks of therapy.  More significant, Dr. Kruger concluded Skiff could perform simple-to-medium complex tasks despite the pain disorder he diagnosed.  Finally, even Dr. Freed concluded Skiff had only moderate difficulties with specific functional tasks, and assigned a GAF of 55.  None of these psychologists explicitly concluded Skiff's mental health impairments prevented her from working.

Further, the ALJ limited Skiff to performing simple and repetitive tasks, requiring concentration in two-hour increments with usual and customary breaks in the workday.  Skiff does not identify any evidence in the medical record, other than possibly Dr. Freed's evaluation which I discuss below, to support more extensive functional limitations caused by any anxiety or pain disorder impairments.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (step 2 error harmless if ALJ considered limitations at step 4).

II.    Medical Evidence

Skiff challenges the ALJ's decision to give less weight to Dr. Freed's findings and opinion than to the findings and opinions of Dr. Besing, Dr. Kruger, and the state agency examining consultants.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may

only reject it for clear and convincing reasons.  *Id.* (treating physician); *Widmark v. Barnhart*,

454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another

physician, the ALJ may not reject the opinion without providing specific and legitimate reasons

supported by substantial evidence in the record.  *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at

1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial

evidence to reject the opinion of a treating or examining physician.  *Widmark*, 454 F.3d at 1066

n.2.  The ALJ was required to give specific and legitimate reasons to disregard Dr. Freed's

opinion.

Here, Skiff argues the ALJ's rejection of Dr. Freed's opinion was internally inconsistent.

First, the ALJ purportedly relied on the other doctors' diagnoses, but did not include those other

doctors' diagnoses as severe impairments.  Second, the ALJ criticized Dr. Freed for relying on

Skiff's subjective statements when the other doctors also relied on those same statements.

I see no internal inconsistency in the ALJ's analysis.  She rejected conclusions of all the

doctors who relied on Skiff's subjective complaints or which were not supported by the treatment

records.  *See* Tr. 27 (rejecting Dr. Besing's diagnosis of pain disorder as based on Skiff's self-

report); *id.* (rejecting Dr. Freed's diagnoses of PTSD, panic disorder, social phobia, cognitive

disorder, ADHD, reading disorder and disorder of written expression as not supported by other

evaluators *or her treatment records*).  The ALJ properly justified her decision not to adopt the

multiple diagnoses offered by Dr. Freed, and the ALJ fairly assessed Dr. Freed's multiple

diagnoses as overly reliant on Skiff's statements and unsupported by the medical record.

Skiff also suggests the purpose of Dr. Freed's evaluation, as a more comprehensive

examination of functional limitations, should weigh more than Dr. Besing's findings arising out

of treatment or Dr. Kruger's conclusions based on a psychodiagnostic interview.  However, it is the ALJ who assesses the medical evidence.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (ALJ is "final arbiter" of medical evidence).  Substantial evidence supports the ALJ's decision to give more weight to Dr. Besing's findings, since he met with her on more occasions than any of the other psychologists, and on Dr. Kruger's opinion, which was supported by comprehensive testing.

Skiff also disputes the ALJ's assertion that Dr. Freed failed to address Dr. Besing's and Dr. Kruger's evaluations.  With respect to the ALJ's rejection of Dr. Freed's testing decisions, Skiff suggests the need for a medical expert to identify the necessary tests, argues the ALJ is not sufficiently educated on the subject to give such an opinion, and the ALJ failed to address the reasons Dr. Freed gave for his making the testing decisions he did.

The ALJ was correct to point out Dr. Freed's failure to accurately address the MMPI-2-RF test results obtained by Dr. Besing.  Dr. Besing noted Skiff's "over reporting of physical symptoms" which "may have affected the somatic scales of this instrument."  Tr. 283.  Dr. Freed recorded only that Dr. Besing had administered the MMPI-2-RF, but had not diagnosed a personality disorder at that time.  Dr. Freed decided not to administer the MMPI-2 as a result of Skiff's "affective, anxious and pain behaviors[.]"  Tr. 445.  The ALJ could reasonably question the doctor's decision not to administer a test that may confirmed Skiff's over reporting tendency.

Further, the ALJ correctly questioned Dr. Freed's decision not to credit prior evaluations or exam results, while at the same time declining to test Skiff's effort himself.  Regardless of the debate about the usefulness of these tests, Dr. Freed's rejection of all three test results which

suggested Skiff has a tendency to exaggerate,[2] as well as his decision not to administer any other

test he thought would be valid to show Skiff's effort, undermined the persuasiveness of Dr.

Freed's opinion.  The ALJ's decision to give less weight to Dr. Freed's opinion is supported by

substantial evidence in the record.

Finally, Skiff argues the ALJ misread Dr. Freed's assessment as not supportive of

disability.  Skiff notes the ALJ did not include many of the limitations identified by Dr. Freed.

Skiff suggests the ALJ would have included those limitations in the RFC if the ALJ honestly

believed Dr. Freed's findings did not support disability.

The ALJ read Dr. Freed's opinion to be consistent with the other evaluations in the

record, finding Skiff capable of understanding, remembering and carrying out simple, repetitive

tasks in two-hour increments.  There is support for the ALJ's interpretation in Dr. Freed's

opinion.  Dr. Freed assigned a GAF of 55, which suggests only moderate symptoms.  The doctor

commented that based on his record review, the client interview, and testing, Skiff demonstrated

an average level of functioning.  He concluded she would have very little trouble remembering

work-like procedures, understanding, remembering and carrying out simple instructions,

performing activities within a schedule, coordinating with co-workers and interacting with the

general public, and responding to changes in the work setting.  The ALJ's RFC accounted for

---

[2] At least one of the tests Dr. Kruger administered should have been considered by Dr.
Freed.  Dr. Kruger explained the TOMM is a test of an individual's motivation and effort, as well
as a way to test the validity of memory problems.  Tr. 416.  Contrary to Dr. Freed's criticism, Dr.
Kruger administered the TOMM with good reason.  Disability Determination Services forwarded
to Dr. Kruger the third party Activities of Daily Living Questionnaire completed by Skiff's
husband which discussed Skiff's memory problems.  Tr. 236; *see also* Tr. 223 (Skiff's
complaints of poor memory in her own function report); Tr. 207 (agency forwarded information
to Dr. Kruger).  Accordingly, Dr. Freed's decision to ignore evidence Skiff exaggerated her
deficits was a specific and legitimate reason to question Dr. Freed's opinion.

limitations Dr. Freed noted with respect to Skiff's problems with detailed instructions and maintaining attention for extended periods.

On the other hand, Dr. Freed identified a few "moderate" limitations on the Functional Assessment Form that the ALJ did not account for.  "Moderate" is defined to mean "able to perform" with some "noticeable difficulty . . . from 11-20 percent of the work day or work week[.]"  Tr. 450.  Dr. Freed thought Skiff was moderately impaired in the following functional ways:  maintain regular attendance; sustain ordinary routine without supervision; complete normal work day and work week without interruptions from psychologically based symptoms; accepting instructions and criticism from supervisors; get along with coworkers without distracting them; and setting realistic goals.  The VE did not testify as to the effect of these limitations on the jobs she identified and, accordingly, there is no support for the ALJ's statement that Dr. Freed's assessment "does not support a finding of disability."  Tr. 27.

Regardless, any error the ALJ made is harmless and would not alter the outcome of the decision.  *Ludwig v. Astrue*, 681 F.3d 1047, 1053 (9th Cir. 2012).  The clear import of the ALJ's decision is that she gave only some weight to Dr. Freed's opinion.  Further, the ALJ remarked that Dr. Freed relied on Skiff's self-reports; this is a specific and legitimate reason to discount these moderate limitations.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (physician's opinion of disability may be rejected if it is "based to a large extent on a claimant's self-reports that have been properly discounted as incredible").  The remaining moderate limitations are not supported by Dr. Freed's findings, are internally inconsistent, and are not supported by the medical record.  For example, nothing in Dr. Freed's opinion or in the medical record supports Dr. Freed's conclusion that Skiff's mental impairments would cause her to have

trouble with co-workers or supervisors, have difficulty maintaining attendance, sustaining an

ordinary routine without supervision, or completing a normal workday or work week. *Crane v.*

*Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (permissible to reject check-off reports from physicians

that do not contain any explanation of the bases for the conclusions). Accordingly, given the

facts of this case, and the way the ALJ phrased her conclusions, there is substantial evidence to

support the ALJ's finding that Skiff is not disabled. *See Jamerson v. Chater*, 112 F.3d 1064,

1067 (9th Cir. 1997).

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and

the correct legal standards. For these reasons, the court affirms the decision of the

Commissioner.

IT IS SO ORDERED.

DATED this \_\_\_\_30th\_\_\_\_ day of September, 2015.


\_\_/s/ Garr M. King_____
Garr M. King
United States District Judge